Good morning, your honors. May it please the court. I'm Timothy Presso on behalf of the plaintiff's appellants. I'd like to reserve two minutes of my time for rebuttal. Plaintiffs in this case challenged federal agency authorizations for expansion of a southeast Idaho phosphate mine that is already a federal surplus site due to selenium pollution from existing mining operations. The U.S. Forest Service and Bureau of Land Management have authorized the GR Simplot Company to expand its Smoky Canyon phosphate mine south into two roadless areas of the Caribou National Forest. There is a substantial question whether large scale open pit phosphate mining such as at Planet Smoky Canyon can in fact be accomplished in the southeast Idaho region without violating water quality standards. In the challenged decision, the agencies determined that the Smoky Canyon expansion would be the first to effectively do so. However, in reaching this conclusion, they relied on a modeling analysis that failed to consider a key factor and was therefore admittedly uncertain and a selenium cleanup plan for the existing mine that was based on an analysis that the agencies themselves pointedly declined to endorse. In so doing, the agencies violated the Clean Water Act, the National Forest Management Act, and the National Environmental Policy Act. Nevertheless, the district court in this case denied our motion for a preliminary injunction to halt the mining activity until our claims could be fully adjudicated. As a result, the mining company has now constructed a road into the roadless area and is preparing to log the roadless area and remove topsoil in the roadless area in preparation for mining. By the way, before I forget, speaking of final adjudication, what is the status of the case in district court now? Your Honor, the parties have recently agreed upon a scheduling order. The government has produced the record and we're preparing for summary judgment briefing. There has been no further merits proceedings in the district court. There hasn't been a briefing on the summary judgment motion yet? No, not yet. Except for hearing on it? No. But this is likely going to be resolved on summary judgment one way or the other. That's correct, Your Honor. Because you have a... Yes. There's no... You aren't attempting to introduce material outside the administrative record? No. The parties have agreed on summary judgment as an appropriate mechanism to dispose of the case. Under a scheduling order, you have an agreed date on which the judgment is going to be heard? No, Your Honor. The motion is going to be heard? No. Frankly, Your Honor, I think given that this case was fully briefed and submitted to this court, I think all parties and perhaps even the magistrate judge were awaiting some further guidance from this court. However, we did put a stipulation in the scheduling order to the district court that we would revisit the schedule upon receiving this court's ruling to determine whether adjustments needed to be made to protect the interests of the various parties. I think Judge Fletcher had a question. Do you have any ballpark thought as to when this case could be concluded on the merits? Your Honor, if this court were to issue the injunction that we request, we would be perfectly willing to expedite this case and proceed on as expedited a track as is necessary to get it resolved in a manner that resolution can be achieved prior to the time that the existing mine on the site runs out of phosphate ore so that we could get all the claims adjudicated without a possibility of disrupting phosphate supplies to the Pocatello Fertilizer Plant if it were the case that our claims were not meritorious. Of course, we believe our claims are meritorious, but nevertheless, we would agree, and we've always agreed from the beginning of this case, that we would be willing to move the case on that kind of track. Your Honor, I'd like to turn to the merits issues. The government's decision that this mine expansion could comply with Idaho's selenium water quality standard of five micrograms per liter was founded on two analytical pillars. The first was this store and release cover, which was an engineered cover system that they predicted would reduce water flow through the mine's selenium-bearing waste rock to a level that would reduce the selenium flow enough to satisfy water quality standards, but only if the cover were combined with the second pillar, which was the cleanup of the existing mine, where currently there is selenium pollution at six times the state water quality standard. Neither of these pillars could bear the weight that the government placed upon them. First, as to the store and release cover, the agencies concluded this cover would satisfy water quality standards, but in doing so, they failed to consider the single most important factor affecting the performance of a cover at this high elevation, heavy snowfall environment, and that's how will it perform seasonally. Two-thirds of annual precipitation, 22 of the 33 inches of precipitation that this cover is going to have to deal with will come in the form of spring snowmelt accompanied by rain and precipitation events primarily in May. So there's this huge concentration, this deluge of water in one season, but instead of examining that seasonal impact, the agency's modeling yielded only an annual average water flow output through the cover. The most distinguished member of the agency review team that examined the cover modeling, Dr. Christopher Carlson, the Forest Service's National Groundwater Team Leader, criticized this omission and said in his January 2007 memo, the modeling did not, quote, describe how seasonal variations in precipitation, snowmelt, freeze-thaw, or evapotranspiration, that's the process of plants bringing water back up out of the soil, will affect cover performance. So this was a huge omission in the agency's modeling, the most relevant factor, and the district court abused its discretion in addressing this issue because what the district court said was, hey, this is a dispute between scientists, we courts don't get involved, see Lands Council v. McNair. But the problem with that analysis is that scientists did not disagree on this scientific point. They all agreed, yes, it didn't consider seasonal performance, and yes, the modeling was therefore uncertain. There was agreement, unanimity on that point. If you look at Mr. Stout's July 2007 memo at Volume 2 of the Excerpts of Record, page 106, they admit this point. The only thing they disagreed on was, do we do more modeling before we start digging up selenium-bearing waste rock, or do we wait and do monitoring after we start digging up selenium-bearing waste rock in order to resolve this uncertainty? They chose the latter. In so doing, they violated the law. They violated the Clean Water Act and NIFMA guarantees for clean water standards because they failed to consider the most relevant factor in determining that this mine would comply with the stringent selenium standard. They violated NEPA because they didn't disclose this uncertainty. They didn't disclose what they said in the July 2007 memo, which was the failure to consider seasonal performance led to uncertainty in the modeling. If you look at the EIS and the Record of Decision, they tell us, we know everything we need to know, we're ready to go forward, this thing will work. If you look at the internal documents, they say, there's some uncertainty here, we don't know about the modeling results, but we're going to go out and do some testing to figure it out. NEPA requires upfront disclosure, not hiding it in the internal documents of the agency. Your Honor, I'd also like to talk briefly about the circle of cleanup portion of the agency's analysis. As I said, the existing mine is producing selenium at up to six times the state water quality standard. The agency knew that even if this cover performs up to their highest hopes in order to comply with state law, the state water quality standard, and therefore the Clean Water Act, they have to clean up the existing mine. They said, there are two cleanup actions planned. Cleanup of the Pole Canyon dump, which was where they dumped old selenium-bearing waste rock in a stream valley. Now, they claim that as to that, that's cured by going around with the pipe. That is, I think, Your Honor, that action has occurred too recently for us to know the answer to whether it is, but our point, and I should say, the district court also placed a lot of emphasis on the fact that the Pole Canyon situation is cleaned up. We don't know the answer to that, but even assuming that's true, the problem is, our point is not that Pole Canyon wasn't effectively cleaned up. Our point is that even if it was effectively cleaned up, the agencies identified only Pole Canyon and the mine's existing e-panel as the sources of the pollution. When, by their own admission, when they looked at the Simplot contractor analysis that came to that conclusion, they said, well, that's one possible interpretation of the data. It's preliminary, and it needs further investigation. So even if those, even if Pole Canyon is effectively cleaned up, the problem is the agencies admittedly don't know whether there are other sources that are not, there are no, for which there are no remediation plans that are also contributing to the pollution, and they admittedly don't know that. Now what does the water tests now show as to the level of selenium? Your Honor, the most recent tests I'm aware of, which are the tests in the administrative records, show that there continues to be a significant problem, and I think the results of the Pole Canyon testing, I'm not aware of what the most recent results are, but the problem has not been remedied in terms of the overall mine for sure. Pole Canyon is one site. There is also Panel E, there's Panel A, there is a series of panels from A through E that have been mined, and the mine is producing high quantities of selenium, and the best the agencies have been able to come up with is to say, it's possible that if you clean up Pole Canyon and Panel E, you'll reduce the selenium enough to allow for the selenium flow from the new mine expansion. That's one possible preliminary determination requiring further investigation, their words not ours, and yet based on this possibility, they authorize this massive environmental disturbance excavating two new panels, dumping more selenium-bearing waste rock into pits, on the hope that the possibility they identified would prove to be right, and the failure to examine that question, consider other sources, consider what the other possibilities are, particularly when EPA, I might add, identified the Panel A as another key selenium source, that is also arbitrary and capricious, and the district court did not consider that question at all. The district court only observed that the Pole Canyon remediation action appeared to be effective and moved on, but that really was never our point, and so that's another instance in which I think this court should determine the district court abused its discretion. I'd like to turn to the harm issues. The district court and a motions panel of this court have denied preliminary injunctive relief in this case, and accordingly, irreparable harm to the plaintiff's interest and to the environment is ongoing. To date, Simplot has constructed an access road approximately two and a half miles into a portion of the Sage Creek roadless area, and is now beginning to log the roadless area. Eventually, the mine expansion will impact 539 acres of this roadless area. This harm to pristine and formerly undeveloped national forest lands constitutes irreparable harm that warrants injunctive relief, and it is ongoing. Once the roadless area is logged, roaded, and scraped bare of its soil, that egg can't be put back together again, no matter what judgment is entered at the conclusion of the summary judgment phase of this case. Nevertheless, the district court here dismissed the harms to roadless areas and said because the plaintiff's claims focus on the ultimate mining's illegality, the predicate access activities, the roading and logging and whatnot, could not be considered. This was error. First. What is your best case to support that point? In other words, your primary complaint is, you know, the Clean Water Act and NEPA type violations with respect to the selenium, but you want protection now from these road activities. And what is your best case that says, well, you know, you're entitled to pursue that, too, on the preliminary injunction? Your Honor, I think this court's Southeast Alaska Conservation Council case, which Your Honor is very familiar with. Yes, I understand, Your Honor. In that case, certainly. I can't remember now, but that was certainly irreversible. I mean, they wanted to fill up an entire lake, right, almost. That's correct, Your Honor. But in this case, the court enjoined the preparatory activities, the roading and logging, that were the essential predicate activities for that project. In this case, it certainly is irreversible in terms of the mammoth changes to an inventory roadless area. I have to ask you for your next best case because, you know, the Supreme Court heard argument on that case very recently. They did, Your Honor. However, they didn't, to my understanding, they did not address the issues surrounding the injunction pending appeal that this court issued. They focused on the merits issues. And so we don't rely on any part of the merits determination. But I would say this, Your Honor, as well, with respect to that issue. We have to consider not only the nexus to the selenium illegality, which we think is sufficient to warrant injunctive relief, but also the Forest Service and the BLM issued a unitary decision here. Both parts were completely interdependent of one of the other. You had to have the access to do the mining. You wouldn't need the access if the mining were not authorized. The Forest Service's obligation here was to take action consistent with the forest plan, the Caribou Forest Plan, which mandates control of mining activities so as to ensure against water quality violations. We submit it is not consistent with the forest plan for the Forest Service to authorize through special use permit these essential predicate activities that pave the way for illegal mining. And so I would say that there is a more direct nexus with the legal allegations in this case and the road construction than there was even in the Southeast Alaska Conservation Council case. Very briefly, Your Honor, because I see my time is running down,  Simplot has asserted job losses and plant shutdowns if an injunction is granted. I want to focus on the timing issue. Originally, when this case was filed, they said there were 13 months of work to prepare the mine. There were two years' worth of existing ore. They are now two months ahead of schedule on the 13 months. They completed the access activities that Mr. Facer in their affidavit said would take five months. Paragraph 5D of his affidavit, they completed those activities in just a shade over three months. You're talking about the road building activity? Yeah, they completed the road building activity in approximately two months' shorter time than was forecast by their mine manager in his affidavit to the district court. My only point, and I will conclude, they're ahead of schedule. There's time to get this case concluded before the existing mine supplies run out. Thank you. Thank you, Counselor. We'll give you a couple minutes for rebuttal. Do you have a time allocation? I do, Your Honor. Don't start the clock yet. I'll be taking 12 minutes, and Al Barker will be taking three minutes. He represents the Intervenor Symbiote. All right. May proceed. Good morning, Your Honors, and may it please the Court. As I said, I'm Justin Fiddeau. I'm here for the Justice Department. I will attempt to take the issues in the order that the appellants did, and as such begin with the issue of the modeling and what exactly Dr. Chris Carlson meant in his comments. And as he expressed to them his suggestions and concerns that he was raising. And I think that the GYC has consistently misunderstood what it is that Dr. Carlson was concerned about. If you look at the same language that was quoted to this Court by Mr. Presso, Dr. Carlson's concern was that the modeling did not describe how seasonal variation in precipitation, et cetera, will affect cover performance. His concern was not that the model ignored that altogether. There is ample evidence in the record that seasonal variation was included in the modeling. There's a declaration by the modeler at Supplemental Exhibit Record 702 and 706, which explicitly states, the model ran on a day-by-day basis. Every day was modeled. I think also the FEIS at Supplemental Exhibit Record 121, where it's describing the sensitivity analysis that was performed, and the FEIS states that evapotranspiration was not found to be a major sort of hook for the sensitivity of the model, because at the times when snowmelt was occurring, there weren't a lot of plants there. So I don't think the issue is that the model itself didn't include, didn't consider this sort of seasonality of the weather. The issue is that because the model was very complex and very hard to run, what happened was at the end of every year it put out a date. So the model would sort of chug along, modeling every day in a continuous fashion, and then at the end of the year it would say how much infiltration has happened in the past year. And so that's the data that was provided to the agency, and that's the concern that Dr. Carlson raised. However, that annual infiltration rate is the most important information with respect to this cover design. You know, but as a practical matter, here we are, we've all prepared for this hearing, and it would have taken four more days of modeling for you to eliminate that issue. I know that's not your fault, but it's something we see sometimes, where you say just taking a little bit more time on the front end to answer the scientific questions would have evaded all of this activity on the back end. Well, I think I have two answers to that question, Your Honor. First, I don't think it's clear from the record that it would really only take four days. It certainly is what, Chris Carlson? Well, I think there's two aspects to that issue. One is that in the stout e-mail at Supplemental Excerpt from Record 1083, he suggests that it could take weeks. However, I think also if you look at his second memorandum that was sent the next day, where he does repeat the four-day prediction, what he says is that Dr. Carlson and the modeler had had a discussion about trying to get this additional information, and the modeler had at first thought this would be easy to do, because he didn't think he would have to rerun the models. He then said that to run some one-dimensional models would take four days. However, Dr. Carlson wanted two-dimensional output models, and there's evidence in the record at Supplemental Excerpt from Record 1056 that to run the two-dimensional models takes substantially longer than the one-dimensional models, up to 27 hours per year that is being modeled. And so at the very least, I just don't think it's clear how long this is going to take. I would suggest to the Court that this is going to do it. I don't want to divert you on that, because the amount of time, just a passing observation in a sense, although it's important in terms of the analysis here about whether there was a fundamental flaw in the methodology or whether or not there was an adequate consideration within the model of the seasonal effects of the drainage. And the other point I want to raise, Your Honor, and this will sort of bring you back to maybe the thread that I was pursuing, this model, the issue that Chris Carlson is raising, Dr. Carlson, is really an issue of whether or not, of how valid the model is. And the FEIS discloses that all modeling is, to some extent, uncertain. And that's because we're trying to run a computer simulation that is going to predict how these real-world materials are going to act. And the question before the agency, and this, I believe, is the technical question that the District Court was focusing on, is how do you deal with the fact that there's some uncertainty in modeling and at what level is your tolerance for that uncertainty? Because you can never get to zero. No matter how much additional modeling they did, they would never be able to answer this question as to whether or not the model perfectly predicts. Well, there seems to be a critical question. Was there adequate modeling as to the runoff from the heavy snowfall? Now, how do you answer that? Yes, Your Honor, I believe that there was. I believe that the modeling considered the runoff from snowfall in its process. Now, how can you support that statement to me? Again, I would refer the Court to the declaration, Supplemental Excerpt of Records 702 and 706, which describes the declaration by Mr. O'Kane. Okay. And it says Supplemental Excerpt of Records 702 and 706. And he states that the model modeled every day. Every day it took these inputs. The inputs to the model were climactic data for this area for 100 years on a daily basis. And so it took this 100 years of daily information and it said, how do we predict the model cover to perform given this precipitation on this day, these climactic conditions? And so, and similarly, I think that the sort of sensitivity analysis further demonstrates that that is what was going on. And I also, as I said, I think that if you look at Dr. Carlson's comments, that his comments do not say the model fundamentally ignored the number one feature of weather patterns in southeastern Idaho. He says that the model output did not describe how the cover would respond. And so what he wanted was, he wanted to be able to say, the model predicts that there will be 0.6 inches of water that will percolate through the cover in a given year. In March, how much of that 0.6 is occurring? In April, how much is occurring? In May, how much is occurring? At the end of the day, the number is still 0.6. All he was looking for was sort of the time slices of this annual data that was being produced on a different scale so that he could say, well, it makes sense to me that in May, 50% of the percolation is being predicted. However, from an environmental effects standpoint, when the percolation is occurring is irrelevant. And this is the reason for that. This cover material is lying above a lot of ground. There's going to be about 200 feet of overburden beneath the cover and then 250 to 700 feet of undisturbed ground underneath that. And what other modeling, this is the CPW model in particular, showed was that all of this ground dampens any sort of variation at the surface. So by the time you get to the deep water table, even variations between years in the amount of precipitation end up getting dampened out. And what you really have is a steady state amount of water entering the deep water table that's determined by the annual average amount of percolation that's being permitted through the cover. And this is because of sort of the storage capacity of... I take it what part of the criticism was is that he was satisfied with perhaps the annual calculations but was looking for a, for lack of a better term, a worst case scenario in terms of drainage in a particular month by a massive amount of snow melt, right? I mean, that's what concerned him. And where's that analysis? Well, again, Your Honor, I don't think that's exactly what concerned him. I'm overly generalizing. That analysis is, I think the agency's reasonably concluded that that analysis was not necessary because of the geology here. You were not going to have this pulse effect that you'd see in other places. For instance, at the Pole Canyon Overburden Disposal Area in 2006, there was a pulse of selenium that entered into Sage Creek. And that occurred because there was so much water coming out of the Pole Canyon Overburden Disposal Area that there was surface flow that allowed the Pole Canyon Creek to continue to flow directly into Sage Creek. And so there was a pulse that occurred during the spring runoff season because of that surface flow. Here, you have a much slower system that is going to dampen any sort of seasonal variation. And therefore, the agency's reasonably concluded that that was not sort of – it wasn't an important factor with respect to their consideration of the effectiveness of this modeling. Would you turn to the surplus situation? Certainly, Your Honor. That's where I was going to go next. First, I'd like to note that I don't think that it's a fair characterization of the FEIS or the agency's decision for them to suggest that they believed that these two activities were the only circle activities that were likely to occur. On the BLM Record of Decision, at Excerpt of Record 225, at the FEIS at Supplemental Excerpt of Record 228 and 487, in each of these cases, the agency discussed the fact that there were ongoing circle activities at the site. There were likely to be more response actions that were necessary. The BLM Rod states that the FEIS was based on as the up-to-date information as possible. And given the fact that we're talking about cumulative effects, I think it's reasonable for the agency to rely on an existing and ongoing process for remediating these sites in the best estimates that are available. Otherwise, you're – essentially, as a predicate to NEPA, we're requiring a full-on circle remedial investigation, which is an incredibly time-consuming and expensive undertaking that is ongoing. I mean, this is what the Forest Service and EPA and Simplot are working on, is fully characterizing all of these situations. I would also like to – Can you just tell us generally what is ongoing? Well, currently, the Pole Canyon remediation, the diversion around Pole Canyon is complete. We've heard about that. Okay, and then I think at Panel E as well, there is – they're completing the planning for how to remediate Panel E. There's additional groundwater monitoring going on. The – and EPA has consistently said that they're intending to do further work. I don't know that it's all been specified at this time. Mr. Perdo, speaking of ongoing work, I'd like to get your response to Mr. Presso's argument that the southeast Alaska case supports the issuance of a preliminary injunction to enjoin what I'll call these collateral activities, like road building, even though the primary thrust of this case is concerned with the Clean Water Act and NEPA and so forth. What's your response to that? I think my response, Your Honor, is that the case did not – the opinion did not discuss the nexus issue at all, and so I don't think that it's binding on this panel with respect to the issue of nexus. That is the – I mean, an injunction was entered with respect to collateral issues in the southeast Alaska case. However, this was not – there was no analysis that was provided as to whether or not there needs to be and to what extent there needs to be a fit. I think other cases, like Kootenai Tribe v. Venneman and Save Our Sonoran, provided that sort of nexus discussion, and so I think that this Court should look to those cases for the way that sort of nexus needs to be sort of – Do you have anything to add to Mr. Presso's sort of summary of the status of the case in the district court? Your Honor, the only thing I will note is that I believe that the scheduling order that is currently in effect calls for a briefing to be completed in September, and so there is – with an eye towards an October argument date, I'm not part – representing the United States in the district court, so I'm not part of those discussions, but that's my understanding of the current status. The only other thing I will add, and then I see that my time is up if I want to leave my colleagues some time, is that the – Make sure Mr. Barker has enough time to argue. Thank you, Your Honor. Relax. That the EPA comments that GYC relies on as raising the panel A, the possibility of a panel A source, were not filed until after the record decision. These were comments on a different – on a monitoring plan, and it's not fair to suggest that the agency should have responded to those comments in issuing this decision because those comments weren't even filed for another month. So I don't think that that is right. And I think, in the end, the real question here is whether or not, as was stated in Churchill County, the agency had the basis for making a reasoned decision. And even if there are other sources of selenium that are contaminating these sites, the agency relied on the best available information. It disclosed the fact that there were potentially other sources – that there were other ongoing circular mediations that were going on. It disclosed the fact that if circular remediation failed, then this project could lead to exceedances. And that's what NEPA requires. It requires a full disclosure. And the agency reasonably believed that that would not occur, but it did provide notice of the fact that if the circular process, which has ample time to move forward given the fact that we're not expecting sort of peak selenium contamination from this project to occur for over 100 years, that there is some remote possibility that the circular process wouldn't function and that the agency did fully disclose that information. And that's what is required under NEPA, and I think that's also more than adequate under the Clean Water Act and the Idaho Water Quality Standards, which all look to whether or not a discharge is likely to cause future selenium or service water standard problems. And here the agency has reasonably concluded that this project is not likely to lead to any further violations of the Clean Water Act or any of the Service Water Quality Standards. Are there no other further questions? Okay, thank you, Counsel. Thank you very much, Mark. And three minutes, was that your allocated time? Two minutes? Well, we'll give you three minutes. I think you've got more to say. We'll give the plaintiffs some time to respond. Albert Barker on behalf of the defendant intervener, J.R. Simplot Company. Also at Council table is David McGuire. He's the attorney for the other interveners, the counties, the United Steelworkers local, and the cities that all are critically concerned about this. What I had agreed with Mr. Padot to do was to focus on the question of the balance of hardships and why the court's determination that a preliminary injunction was not appropriate in this case should be upheld by the court. Obviously, the court's aware of the standards of review, and this is an extraordinary remedy not lightly given. The United States Supreme Court has said that the courts have to balance the hardships between the parties, that there's not an automatic right to an injunction in the event of an environmental injury. What is the hardship to Simplot? The hardship to Simplot, Your Honor, is that in the event that a preliminary injunction is required or is ordered by this court, that Simplot will have to begin laying off workers at the mine. Well, do you have enough supply until, what is it, 2010? Let me explain how that works, Your Honor. The mine does not run out of ore completely until the summer of 2010. The way the mine workers are set up is that there's four tons of overburden or dirt that has to be moved for every ton of ore. If all they're doing is mining ore, you don't need the full complement of people to get the ore out of the ground. You need four times as many people to move dirt in order to keep the mine in progress. So if you shut down the mine today, they're going to have to start laying people off who are doing the preparatory work. That's the problem. It's not simply, well, what happens if we put all five of those people in the bottom of the pit? There's not any room for them. And if you did, you'd accelerate the process and you'd end up running out of ore sooner than that. Isn't that true for every development in which a preliminary injunction is issued, though? Not in every development do you have 210 people working. I don't want to diminish the economic impact of it at all. Please don't misunderstand me. But, I mean, in many cases we see where there is an imminent development and people have geared up in employment and a preliminary injunction has that effect. For example, in the Southeast Alaska case that Judge Tsitsima asked about, it was they didn't have those people employed and were already working. What GYC is asking the court to do is to shut down the mine. That's what their goal is, and they want these people out of work. Beyond the layoff of people, what else? For Simplot, that's the primary purpose, primary effect. There will be disruptions in the flow of ore from the mine to the plant. There's an umbilical cord that supplies this Don plant. There's another 350 people who are dependent upon the supply of ore. Ultimately, that's going to run out. Those people are going to have to be laid off as well. This is the economic engine of southeastern Idaho. $50 million worth of wages alone paid to the people who work for this company. How do you respond to the plaintiff's suggestion today that they would seek an expedited resolution if a preliminary injunction were entered? Well, Your Honor, the schedule we have before the court right now is that the briefing is scheduled to be done in September. The plaintiffs actually asked for delay in the briefing schedule. We tried to get it done sooner than that so we could get it heard. Well, they've now said they would be willing to have a shorter string. And they said that before. So what schedule would suit you, let me put it that way? What schedule would work for you to make sure that this, if a preliminary, and I'm not suggesting we are, I'm just trying to work through, in my own mind, the practicalities of the situation. So if you were to drop a schedule that would minimize the impact to your client, what would it be? Your Honor, I have a question. Please don't think that I'm assuming that we're going to do that, but I just want to work through the practicalities. I don't know the answer to how long we could shut them down before they would start laying off. I suspect very strongly that if I went back to the President and said you're shut down for two months or three months, he would at least lay some people off during that period of time because they're right now doing the work. That's not really the question. The question is how soon can you brief this case and let it come to termination? From your perspective or from the plaintiffs? We could be ready in the district court in a couple of months and have it completed. There was some suggestion in the record here that earlier Judge Williams had issued an order that this was to be briefed this month in April. Was there such an order at one time? No. There was never a briefing schedule. Part of the problem was development of the administrative record and part of the problem was the plaintiffs asked for additional time. We have an administrative record of 100,000 pages of material. So you think a realistic briefing schedule would allow you to complete briefing by when, you meaning both sides? Well, Your Honor, we asked for a briefing schedule that would be completed in the summer and the plaintiffs in the United States asked for it to be moved out for additional time. From my perspective, a realistic briefing schedule may not be the same as everybody else's. Right. We were asking you. You're the effective party on this. Again, we're trying to work through. Right. I don't know if we could. I don't know the answer to that, Judge. But I guess the other thing I'd like to say about the balance of the hardships is that the issue, that the judge didn't ignore the plaintiff's concerns. He went through and said, here's the hardships on Simplot, the hardships on the steel workers, the hardships on the local counties, and that's a significant issue. That's a real issue if we start laying people off. And then he said the impact to the plaintiffs from their preliminary, their primary concern of selenium is not going to happen in the short term. And there's a number of reasons for that, including the fact that we have a consent order with the DEQ that says we have to monitor impacts and take action from the impacts of the operations before anything happens that shows up as a violation of either groundwater or surface water standards. Accepting that as true, what about the issue about putting roads and roadless areas and the damage that occurs? Sure. And the roads in the road, well, the roadless area is in a lease area already leased to Simplot prior to the passage of the roadless rule. And the road is already pioneered between panel E and panel F. That's already in place. What's happening right now is they're building the haul road that will make it big enough and strong enough for ore trucks and logging trucks to come out. The timber has been about, as of, I checked yesterday, as of about 40 percent done on the north pit of panel F. And so there already has been that timbering done. The stream crossing is complete. And the plan currently would be for stripping of the panel to begin sometime in June or July, depending on how the weather breaks and how much of the haul road can get done. I think they're probably four to six weeks out on the current completion of the haul road. Okay. Any further questions? No. Thank you very much. Thank you for your indulgence. And we'll put three minutes on the clock. Thank you, Your Honor. Very briefly, the briefing schedule in the district court was agreed to by the parties before this court had set a hearing. At least my goal in setting it was to allow time for this court to consider the case, given that we'd fully briefed it. We said we'd be prepared to reconsider it after this court ruled, and we stand by that. We will brief the case on a schedule that will minimize the impact to Simplot. Just a few. The road has been constructed, right? Yes. Whatever damage is done from that has been done? Unfortunately. Damage to your client's interest. Yes. Now, explain to me on the haul aspect of it. In other words, what additional damage, from your perspective, would be done by the additional construction that's necessary to make it haul-worthy, if you will? Well, to directly address that, Your Honor, they need to convert the road from a two-track, essentially, to a hundred-foot-wide road for major mining equipment. And that is of concern. But an even greater concern is that they're going to log off the entire area that would be mined and then scrape the topsoil away from that entire area, which fundamentally changes the area from a natural, undeveloped landscape to an industrial facility. And it's not so much the widening of the road as it is all these other things, although we don't like the fact that there's going to be a hundred-foot-wide road punched in here. Okay. To address just a couple of things that the government said, the government, in response to the circle issue, said, hey, this panelee in Polk Canyon, that's just part of it. We're going to be doing a whole lot of other things, so don't worry about it. The problem with that is, if you look at the BLM's record of decision on page 16, it's page 234, the second volume of the excerpts of record, the BLM explicitly says, the analysis in the FEIS does not rely on any other potential remedial actions that could be authorized through mine administration or CERCLA, only the reclamation of panelee and the Polk Canyon diversion. So the entire analysis of water quality compliance was based on only those two, and the reason is because this CERCLA problem has existed now for many years, and the remediation process is moving at a glacial pace, and so the agencies had nothing else that they could reasonably forecast was going to occur, so they had to pin everything on those two actions, and that's what they did. Also, government counsel says, well, the EPA's letter identifying panel A as another possible source was issued post the environmental analysis, so the agency couldn't reasonably respond, but what the EPA said in its comment letter on the draft EIS that was considered in the final EIS, and this is on page 124 of volume two of the excerpts of record, there's an incomplete understanding of how existing mine facilities are contaminating local groundwater and surface water, and to the contribution of selenium to groundwater from the Polk Canyon dump source area relative to other mine panels and dumps. So this issue that we really don't know what the source of this existing selenium is was very well advertised to the agencies prior to their decision. Finally, I would just like to say, Your Honor, we made a motion for an injunction pending appeal. A panel of this court rejected the motion. This panel has now had an opportunity to fully consider the case not on an expedited basis, and I would orally seek to renew that motion, and if the court would entertain a renewed motion, we would certainly follow up with a written motion. And with that, Your Honor, I appreciate the opportunity to speak to you this morning. Thank you, counsel. Thank you all for your presentations today. It was very helpful, and although you didn't speak on behalf of the union, we note your presence here and appreciate the fact you came out. The case will be submitted for decision and will be in recess for the morning. All rise. The court for this session stands adjourned.
judges: B. Fletcher, Tashima, Thomas, Cjj